482 S.E.2d 597

**MI CO., LTD., Respondent,**

v.

**Arthur F. McLEAN, Jr., Trustee under Testamentary Trust contained in the Will of Sarah S. McLean, a/k/a Sallie S. Barnwell, Marvin Brownstein, Charles H. Grove, Edith B. Grove, Betty B. Ramage, Mellon Bank, N.A., as Trustee, South Carolina National Bank, Dew Company, Inc., Mount Hope Cemetery, the United States of America by and through the Internal Revenue Service, and South Carolina Tax Commission, C.A. Earthmovers, Inc., Fleet Real Estate Funding Corp., Pee Dee State Bank, and Pelican Companies, Inc., Defendants, of whom Ocean Drive Presbyterian Church as Successor-in-interest to Arthur F. McLean, Jr., Trustee under Testamentary Trust contained in the Will of Sarah S. McLean, a/k/a Sallie S. Barnwell, Charles H. Grove and Edith B. Grove is Appellant.**

No. 2629.

Court of Appeals of South Carolina.

Heard Dec. 3, 1996.

Decided Feb. 3, 1997.

Rehearing Denied March 20, 1997.

618

Michael W. Tighe, Louis H. Lang and G. Harold Hanlin, all of Callison, Tighe, Robinson & Hawkins, Columbia, for appellant.

James C. Pike, Jr., of Jeffcoat & Pike, North Myrtle Beach, for respondent.

HUFF, Judge:

This is an action involving the foreclosure of various properties. The case was referred to the master-in-equity with direct appeal to the Supreme Court. The appellant, Ocean Drive Presbyterian Church, appeals the order of the master finding that respondent, MI Co., Ltd., is entitled to foreclosure and sale of the property at issue. We affirm.

## FACTS

In 1985, Arthur F. "Joe" McLean and Alex Bosserman approached John F. Cutter about lending some money to McLean. Cutter ultimately agreed to loan McLean $85,-000.00. The loan was to be secured by ten lots. Cutter testified that he, McLean and Bosserman were all friends. McLean recommended a corporation be formed through which Cutter would loan McLean the money. Bosserman, an attorney at the time, was working out of an office supplied by McLean.[1] Consequently, he formed the MI Co., Ltd. for the parties, free of charge. MI Co. never had a bank account of any kind, never did any business and never filed any taxes. The money loaned to McLean actually came from a trust fund.

Cutter testified the terms of the loan were that the payments be made monthly for eighteen months at an interest rate of 22 percent. The loan was evidenced by four separate notes as follows:

1. A $25,000.00 note dated March 22, 1985;
2. A $10,000.00 note dated May 16, 1985;
3. A $25,000.00 note dated August 13, 1985; and
4. A $25,000.00 note dated August 13, 1985.

The notes provided for an interest rate of 12 percent. Cutter testified McLean did not want anyone to know he was paying 22 percent. Cutter refused to accept the 12 percent rate. Consequently, the parties entered into separate agreements, on the same days they signed the individual notes, increasing the interest rate to 22 percent.

The notes were also secured by three separate mortgages. Of particular significance to this case is the mortgage dated March 22, 1985 given as security for the March 22 note for $25,000.00.[2] This mortgage covered property in Myrtle Beach described as "Lots 5, 6 and 7 of Block 21 as shown on that certain map of Section Two of Ocean Drive Estates." Lot number 6 of this property was purchased by Charles and

---

1. Bosserman was subsequently disbarred. *In the Matter of Bosserman,* 298 S.C. 198, 379 S.E.2d 130 (1989).

2. While the order of the master encompasses all the notes and mortgages, it is only the March 22 note and mortgage that is involved on appeal.

Edith Grove on October 11, 1989. On May 8, 1992, the Groves sold Lot 6 to Ocean Drive Presbyterian Church. The Church also purchased Lot 7 from the Estate of Sarah McLean shortly thereafter.[3]

On May 6, 1992, MI Co. brought the present action, filing a *lis pendens*, summons, and complaint. The complaint alleged McLean had failed to make payments as due and asserted $32,172.77 plus interest was still owed on the March 22, 1985 note.[4] Although there was a satisfaction of mortgage dated June 9, 1989, on record at the R.M.C. office in Horry County purporting to satisfy the March 22, 1985 mortgage, the complaint alleged the satisfaction of mortgage was not authorized nor signed by any of the agents or officers of the corporation. Accordingly, the mortgage remained a lien on the property. At trial, Cutter testified the corporation never released this property from the mortgage.

It is undisputed that the signature of Cutter's sister, Ann Bird, as president and secretary of the corporation, was forged on the mortgage satisfaction document. Bosserman testified that Beth McLean, Joe McLean's wife, actually signed Ann Bird's name to the document and notarized the document under her maiden name of Beth Griffin. Mrs. McLean testified that Ann Bird's name was already signed on the satisfaction documents when Bosserman brought them to her to notarize.

At trial, Cutter introduced a ledger showing total payments of $46,089.00 by McLean from March, 1985 through August, 1989. McLean claimed he made additional payments of around $76,440.00 during this period of time and payments totaling $18,700.00 from May, 1990, to January, 1991. The discrepancies were largely due to the fact that McLean alleged he made several large payments in cash, he paid people designated by Cutter instead of paying Cutter directly in some

---

3. The Church sought and was granted an order from the Supreme Court to substitute and add the Church as a party. The Church is the only party to appeal from the order below.

4. At trial, Cutter claimed the balance due was some $16,000 more than the figure calculated from the complaint. Counsel for the corporation asserted there was an error in the complaint and the total due was actually higher.

instances, and a payment of $16,000.00 from a real estate closing was to be made through Bosserman. The record does not indicate why many of the payments were in cash. As to the payments which were not made to Cutter, McLean testified that one payment was made to another individual at Cutter's request. He further stated that, at a certain point, "communications with John Cutter were violent" and that Cutter was calling him in the middle of the night, threatening to kill McLean and his family.[5] He therefore began making payments to Cutter's father, Ervin Cutter. He also claimed to make payments to two of Cutter's brothers-in-law.

## MASTER'S ORDERS

On November 16, 1994, the master issued his order finding that MI Co. had advanced McLean $85,000.00, that the interest rate was 22 percent, and that McLean should be given a credit of $40,341.00 for the payments in dispute. He further found that the releases and satisfactions were not executed by the corporation or its agents but were forgeries and did not effectively release any of the property from the mortgages. He noted the plaintiff had specifically waived deficiency judgment and determined the corporation was entitled to foreclosure of the mortgages and sale of the property. The Church filed a motion to alter or amend judgment, asserting, among other things, that the court failed to rule on the issue of the effect of the foreclosure action on the defendants who purchased the property relying on the public records. On May 24, 1995, the master issued an amended order finding it was stipulated the defendants had relied on the public records and forged releases and satisfactions in purchasing the property. He further found as follows:

It is the specific finding of this Court that notwithstanding such reliance upon the public record, the Plaintiff's mortgage must be given priority. It is the general rule that

---

**5.** McLean testified he was receiving calls in the middle of the night from Cutter, threatening him with bodily harm and threatening to ruin his reputation. He further testified Cutter threatened to kill him and his family, stating that he (Cutter) would send his father to "get" him because his father was dying anyway and had nothing to lose. McLean's daughter also testified that Cutter called their house around 2:30 one morning and threatened to blow McLean's head off, as well as everybody else in the family.

where the equities as between two competing claimants are balanced as is the case in this fact situation, then the first in time on the record shall prevail.... All are innocent parties with relation to the prime Defendant. Thus, the mortgages of the Plaintiff, being first in time, have priority.

## ISSUES

The Church raises three issues on appeal:

1. Did the master err in setting aside the mortgage releases based on forgery of the document when such action would result in grievous harm to an innocent third party?

2. Did the master err in accepting any of the evidence presented by either the mortgagee/lender or the borrower when neither presented credible evidence and where the burden would fall on an innocent third party?

3. Did the master err in concluding the appropriate interest rate was 22 percent where the mortgage only referenced the note bearing a rate of 12 percent, and the agreement purporting to raise the rate to 22 percent was not signed by the mortgagor?

## LAW/ANALYSIS

### Standard of Review

An action to foreclose a real estate mortgage is one in equity. *Dockside Association, Inc., v. Detyens,* 294 S.C. 86, 362 S.E.2d 874 (1987). In equity cases, we may find facts in accordance with our own view of the evidence. *Id.*

### Issue I

The appellant first contends the master erred in setting aside the mortgage satisfaction because it would result in harm to an innocent third party. The appellant argues that the mortgagee, MI Co., was neither an innocent party nor without fault or negligence. It asserts that MI Co. is really a sham corporation whose main witness is a convicted felon, and that MI Co. failed to take action on the note until more than five years after it became due. Accordingly, it would be inequitable to set aside the mortgage satisfaction.

Generally, a fraudulent satisfaction will not prevent a mortgagee from foreclosing a mortgage. *Pilkington v.*

624

*McBain,* 274 S.C. 312, 262 S.E.2d 916 (1980). Research reveals no recent South Carolina case law addressing the effect of a fraudulent satisfaction on an innocent third party who subsequently takes an interest in the mortgaged property. However, in the 1884 case of *City Council of Charleston v. Ryan,* 22 S.C. 339 (1884), the court held, where the mortgagee endorsed his name in blank on the back of the mortgage and a satisfaction was thereafter written above his signature, the mortgagee must bear the consequences of the act made possible through his negligence, and an innocent subsequent purchaser would be protected. The court noted the well settled principle of equity "that where one of two innocent parties must suffer loss, it must fall on the party who, by incautious and misplaced confidence, has occasioned it or placed it in the power of a third party to perpetrate the fraud by which the loss has happened." 22 S.C. at 356. Further, in the 1930 case of *Young v. Pitts,* 155 S.C. 414, 152 S.E. 640 (1930), it was held that a satisfaction entered through mistake does not destroy the priority of the mortgage unless others are misled and injured thereby. The court quoted from *Corpus Juris* as follows: "Generally, when the release or satisfaction of a mortgage is the result of fraud, accident or mistake, it will not inure to the benefit of a person acquiring an interest in the property, who did not rely or advance anything on the faith of such discharge." 155 S.C. at 420, 152 S.E. at 642.

We agree with appellant that equitable principles may be applied to effect the remedy of cancellation of a mortgage satisfaction. *Sempf v. Ruhlman,* 415 So.2d 759 (Fla. 2d DCA 1982). In order to effect cancellation under these equitable principles, the mortgagee must be free of negligence to prevail. *Id.* Generally, a fraudulent or mistaken satisfaction is undone in situations where there is no third party with no notice of the fraud or mistake, who subsequently and in good faith acquires an interest in the property. *Sunrise Savings and Loan Association of Fla. v. Giannetti,* 524 So.2d 697 (Fla. 4th DCA 1988). However, where the mortgage cancellation is attributable to the mortgagee who, for example, makes the fraud possible through his negligence, the court will not interfere to protect the mortgagee at the expense of the innocent person deceived by the fraud. *Id.* In the equitable principle involved, use of the concept "negli-

gence" refers to lax conduct on the part of one innocent party, but for which the other innocent party would have been protected from the deceit. *Id.*

Turning to the case at hand, the master found the equities between appellant and respondent to be balanced. Appellant states an arguable position that the corporation was negligent in sitting on its rights for over five years. By the terms of the loan in question, the note became due in September, 1986. Based on Cutter's testimony, he last received a loan payment in August, 1989. Yet the corporation waited until May, 1992, to bring any kind of legal action. Further, the record reveals the transactions between Cutter and McLean were extremely suspect, given the evidence of the large cash payments, the corporation having been created apparently for the sole purpose of funneling the money, the side agreement increasing the interest rate an additional 10 percent, the loan payments made to other specified persons, and the means employed by Cutter to collect on the debt.

S.C.Code Ann. § 30–7–10 (1991) provides in pertinent part:

All deeds of conveyance of lands, ... all mortgages or instruments in writing in the nature of a mortgage of any real property, ... all assignments, satisfactions, releases, and contracts in the nature of ... liens on real property created by law or by agreement of the parties and generally all instruments in writing conveying an interest in real estate required by law to be recorded in the office of the register of mesne conveyances or clerk of court in those counties where the office of the register of mesne conveyances has been abolished or in the office of the Secretary of State delivered or executed after July 31, 1934, except as otherwise provided by statute, are valid so as to affect the rights of subsequent creditors (whether lien creditors or simple contract creditors), or purchasers for valuable consideration without notice, only from the day and hour when they are recorded in the office of the register of mesne conveyances or clerk of court of the county in which the real property affected is situated. In the case of a subsequent purchaser of real estate, or in the case of a subsequent lien creditor on real estate for valuable consideration without notice, the instrument evidencing the subsequent convey-

ance or subsequent lien must be filed for record in order for its holder to claim under this section as a subsequent creditor or purchaser for value without notice, and the priority is determined by the time of filing for record.

This statute indicates our recording act is a race-notice act which will provide protection to a subsequent purchaser or creditor *provided he records first. Leasing Enterprises, Inc. v. Livingston,* 294 S.C. 204, 363 S.E.2d 410 (Ct.App.1987). Thus, in order to cut off a prior lien such as a mortgage, the purchaser must have no knowledge of the outstanding lien and win the race to the recording office. *Goldstein v. Gold,* 106 A.D.2d 100, 483 N.Y.S.2d 375 (1984).

S.C.Code Ann. § 15–11–20 (1976) provides:

From the time of filing only, the pendency of the action shall be constructive notice to a purchaser or encumbrancer of the property affected thereby, and every person whose conveyance or encumbrance is subsequently executed or subsequently recorded shall be deemed a subsequent purchaser or encumbrancer and shall be bound by all proceedings taken after the filing of such notice to the same extent as if he were made a party to the action. For the purposes of this section, an action shall be deemed to be pending from the time of filing such notice.

Thus, when a notice of pendency is filed as in this case, a purchaser is charged with constructive notice of litigation if his conveyance or encumbrance is subsequently executed or recorded. *See also Pipkin v. Fletcher,* 165 S.C. 98, 162 S.E. 774 (1932) (one may not rely upon purchase or encumbrance made after filing of a *lis pendens* ). That the purchaser lacks actual knowledge of the filing is irrelevant. *Goldstein,* supra at 101, 483 N.Y.S.2d 375. Perceived equities in favor of a purchaser are thus of no moment. *Id.* Because the Church purchased the property from the Groves two days after the filing of the *lis pendens,* and from the estate of Sarah McLean thereafter, it was on notice of the litigation involving the property. We therefore find no error in the setting aside of the fraudulent mortgage satisfactions.

## Issue II

■ Appellant next contends the master erred in accepting the testimony of both Cutter and McLean because Cutter is a convicted felon and McLean or his wife had a role in the

mortgage satisfaction forgeries. It contends the master could not make credibility judgments, as evidenced by the master's allowance of some of the disputed payments with no rational basis for disallowing others. The Church argues the master should have rejected the evidence presented from both sides "leaving the property of the Presbyterian Church unmolested by either side to this transaction."

 While we would agree that there is evidence of record which impeaches the credibility of both Cutter and the Mc-Leans, it is evidence for the master, sitting as the trier of facts, to consider in making his findings of fact. The issue of credibility in such a situation is best left to the master and it is inappropriate for the reviewing court to substitute its judgment for that of the master. *Todd v. Bullard Funeral Home, Inc.,* 286 S.C. 479, 334 S.E.2d 524 (Ct.App.1985). Further, upon a thorough review of the evidence, it appears that the majority of the disputed payments for which the master gave McLean credit were (1) evidenced by a check or receipt, (2) included in McLean's written record, or (3) verified by a third person. We therefore find no merit to this argument.

### Issue III

 Finally, the Church contends the master erred in finding the appropriate interest rate was 22 percent. It argues the mortgage, although referencing the original note, does not mention the separate agreement raising the interest rate from 12 to 22 percent. Consequently, because there was no reference to a separate agreement, no third party would be put on notice that further inquiry was necessary to determine the true rate of interest.[6] It therefore asserts the agreement raising the interest rate should not be enforceable against the Church.

The agreement raising the interest rate was found by the master to be enforceable against McLean, not the Church. The Church is simply affected because the higher rate increases the amount due on the loan and, consequently, the mortgage against the property. Nowhere does the Church argue against the legality of the interest rate agreement. Rather, it

---

**6.** Although the Church asserts in its issues raised on appeal that the master erred in applying the 22 percent interest rate because the separate agreement was not signed by the mortgagor, it cites no case

contends such a rate should not be applied to affect the mortgaged property because it had no notice of this higher rate. We first note the Church cites no law requiring that the amount of an interest rate affecting a mortgage be put on record. However, even if we were to agree that a third party would be misled by a mortgage which references a note containing an incorrect interest rate, there is no evidence the Church was in fact misled in the case in hand. To the contrary, the Church's position was that the note in question had been satisfied and, therefore, the interest rate would be of no consequence. Accordingly, the Church did not rely on the interest rate stated in the note and has suffered no prejudice.

For the foregoing reasons, the order below is

**AFFIRMED.**

HOWELL, C.J., and HOWARD, J., concur.

---

law to support this assertion and has completely failed to address it in her argument. This argument is therefore deemed abandoned. *Potomac Leasing Co. v. Glasco Industries, Inc.*, 294 S.C. 494, 366 S.E.2d 26 (Ct.App.1988).